## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FBI WIND DOWN, INC. (F/K/A FURNITURE | ) | Case No. 13-12329 (CSS) |
| BRANDS INT'L, INC.), *et al.* | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| FBI WIND DOWN INC. LIQUIDATING TRUST, | ) | |
| BY AND THROUGH ALAN D. HALPERIN, | ) | |
| AS LIQUIDATING TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 15-51077 (CSS) |
| | ) | |
| INNOVATIVE DELIVERY SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### OPINION

**BLANK ROME LLP**
Victoria A Guilfoyle
1201 Market Street
Suite 800
Wilmington, DE 19801

    -and-

HAHN & HESSEN LLP
Jeffrey Zawadzki
488 Madison Avenue
New York, NY 10022

Co –Counsel for Plaintiff

**SULLIVAN, HAZELTINE & ALLINSON LLC**
Elihu E. Allinson III
901 North Market Street, Suite 1300
Wilmington, DE 19801

Counsel for Defendant

Dated: February 16, 2018

Sontchi, J. _Christopher S. Sontchi_____

## INTRODUCTION[1]

Before the Court is a motion for summary judgment, filed by the Plaintiff,[2] seeking a determination whether thirty-two[3] transfers (collectively, the "Transfers") qualify as avoidable preferences outside any 11 U.S.C. § 547(c) defenses, whether such Transfers can be disallowed under § 502 and the Plan, and whether the Transfers are *per se* for less than reasonably equivalent value if not preferential.

For the reasons set forth below, the Court will grant summary judgment, in part, on certain § 547(b) elements and the lack of any § 547(c)(1) contemporaneous exchange of new value defense, and deny the remainder of the Motion. Specifically, the Court finds:

a.     The Transfers meet the § 547(b) preference elements, with the exception that there is a dispute of material fact regarding whether the Transfers were (1) an interest of TRI in property, (2) to or for the benefit of TFI a creditor, and (3) on account of an antecedent debt of TFI.

---

[1] The Court hereby makes the following findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are also adopted as such.

[2] Capitalized terms herein shall have the meaning ascribed to them *infra*.

[3] The Motion attempts to collect on one additional wire transfer worth $32,271.84 paid on September 9, 2013, identified in discovery and not listed in the Liquidating Trustee's complaint. The Liquidating Trustee claims the wire transfer should be reviewed as the complaint sought "to avoid and recover all transfers, whether such transfers presently are reflected on the annexed exhibit or not." Defendant objects to the wire's inclusion. The analysis *infra* does not include the wire transfer since it was not "identified with particularity to ensure that the [D]efendant receives sufficient notice of what transfer is sought to be avoided." The Liquidating Trustee may seek leave to amend their complaint to include the additional transfer if they so choose. Adv. Pro. No. 15-51077, D.I. 68, ¶ 13; *Miller v. Mitsubishi Digital Electronics America Inc. (In re Tweeter Opco)*, 452 B.R. 150, 154 (Bankr. D. Del. 2011) (citing *Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.)*, 08-50248, 2008 WL 4239120, at *5 (Bankr. D. Del. Sept. 16, 2008) and *Pardo v. Gonzaba (In re APF Co.)*, 208 B.R. 183, 188-89 (Bankr. D. Del. 2004)); *see also infra*, n. 34.

b.      A dispute of material fact remains over whether the § 547(c) ordinary course of business and subsequent new value defenses apply, but summary judgment is granted for the lack of contemporaneous exchange of new value.

c.      A determination of disallowance, objection, or setoff is inappropriate at summary judgment when preference status is in dispute.

d.      A dispute of material fact remains as to whether the Transfers were given for less than reasonably equivalent value in satisfaction of § 548(a)(1)(B)(i).

e.      Discovery is reopened for ninety days after entry of the order to procure additional evidence on the fraudulent conveyance count.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 11 U.S.C. § 157(b)(2)(A) and (O).  Venue is proper before the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. §§ 1408 and 1409.  The Court has the judicial authority to enter a final order.

## STATEMENT OF FACT

### A.      Procedural Background

On September 9, 2013 (the "Petition Date"), FBI Wind Down, Inc. (f/k/a Furniture Brands International, Inc.) and eighteen affiliated companies, (together, the "Debtors") filed a voluntary petition for Chapter 11 relief.[4]  On October 2, 2013, the Debtors filed their schedule of general unsecured claims; Defendant was identified as having three

---

[4] Del. Bankr. 13-12329, D.I. 1.

claims (the "Claims").[5]   On July 14, 2014, the Court entered an order confirming the Second Amended Joint Plan of Liquidation of FBI Wind Down, Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code (the "Plan").   The Plan partially consolidated the Debtors into groups based on prepetition business and operations.[6]

Under Section 7.3 of the Plan, the Liquidating Trustee has rights to pursue any existing or potential Causes of Action (as defined in the Plan) including those under 11 U.S.C. §§ 547-50.[7]   Alan D. Halperin was appointed as Liquidating Trustee ("Liquidating Trustee" or "Plaintiff") for FBI Wind Down, Inc. Liquidating Trust and continues to serve in that capacity.[8]   On August 19, 2015 the Liquidating Trustee brought this present action against Innovative Delivery Systems, Inc. ("IDS" or "Defendant") seeking (a) avoidance of preferential transfers under §§ 547 and 550, or (b) the avoidance of constructively fraudulent transfers if "the Transferring Debtor was not the Debtor who incurred the debt," and (c) objecting to any claims filed or scheduled on behalf of IDS, including the Claims.[9]   Defendant answered with six affirmative defenses, including defenses for contemporaneous exchange of new value, ordinary course of business, and new value.[10] Following the Court's procedures, both parties participated in mediation but were

---

[5] Defendant held Claim Nos. 354003740, 343008090, and 341001410.  *See* Adv. Pro. No. 15-51077, D.I. 68, A0715.

[6] Del. Bankr. 13-12329, D.I. 1799, 1840.

[7] *Id.* at pp. 33-35.

[8] Adv. Pro. No. 15-51077, D.I. 65, p. 12 (remaining docket items *infra* cite to the adversary proceedings).

[9] D.I. 1; *see also* D.I. 65, ¶ 1.

[10] D.I. 30.

unsuccessful in reaching an accord.[11]  Written discovery and depositions, including that of Howard Dell, were subsequently conducted according to a scheduling order, with fact discovery closing on April 3, 2017 and expert discovery closing on July 7, 2017.[12]

On July 31, 2017, the Plaintiff filed this motion for summary judgment (the "Motion") seeking avoidance of certain preferential or fraudulent transfers under §§ 547, 548, 550, and 551, as well as the disallowance of IDS's claims pursuant to § 502 and the Plan.[13]  The Motion has been fully briefed and this matter is ripe for decision.

### B.    Factual Background

#### 1. Thomasville Debtor Group

The substantively consolidated group at issue in the present Motion is the "Thomasville Debtor Group" or "Thomasville Group," which consists of TFI Wind Down, Inc., f/k/a Thomasville Furniture Industries, Inc. ("TFI"); THF Wind Down, Inc. f/k/a Thomasville Home Furnishings, Inc.; and TR Wind Down, Inc. f/k/a Thomasville Retail, Inc. f/k/a Classic Design Furnishings, Inc. ("TRI").[14]  The entire Thomasville Debtor Group operated to produce and sell furniture under the brand name "Thomasville."[15]

---

[11] D.I. 9.

[12] D.I. 38.  Dell's deposition produced contradictions with his previously documented affidavit.  To the extent such contradictions exist, this memorandum assumes the deposition controls.  *See Fulcrum Direct, Inc. v. Assoc. Footwear, Inc. (In re Fulcrum Direct, Inc.)*, 2003 Bankr. LEXIS 318, *13, n.9 (Bankr. D. Del. 2003) (citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken …").

[13] D.I. 65.

[14] *Id.* at ¶ 3.

[15] D.I. 66, A0006 (*Graham Dec.*, ¶¶ 16-18).

TFI owned the manufacturing facilities, contracted with third-party suppliers to supply the goods necessary to make the furniture, and manufactured Thomasville furniture. TRI was a subsidiary of TFI that operated in tandem. TRI operated all the retail stores, leased the locations, hired its own employees to manage stores, contracted with third parties to provide services, and sold Thomasville furniture. As a result, a customer purchasing Thomasville furniture would pay TRI at their store and have their order relayed to TFI, who would manufacture and arrange shipment of the product.[16]

In addition to operating two separate but related business entities, both TFI and TRI had related but independent roles in Thomasville's cash management system. TRI collected payments from consumers who purchased Thomasville furniture. When TRI received a payment, the proceeds would go into zero-balance deposit accounts in the name of TRI, which were swept into the Debtors' operating accounts, and then wired back to brand-specific disbursement accounts.[17] All Thomasville Group payments were channeled through the brand's disbursement account, which was in the legal title of TFI, and controlled through the centralized cash management system of the parent, Furniture Brands International, Inc. ("Furniture Brands"). TFI's disbursement account made all payments for the Thomasville Group, including all payments owed by TRI.[18]

---

[16] *Id*. at A0006-9 (*Graham Dec.*, ¶¶ 16-22).

[17] D.I. 68, A0516-644 (*Schnitzer Dec.*, Exh. B-C).

[18] D.I. 66, A0007 (*Graham Dec.*, ¶ 19).

### 2. *Thomasville Debtor Group and IDS*

IDS was a third-party vendor utilized by the Thomasville Group to provide warehouse and delivery services. Once TFI manufactured a piece of furniture, the piece was sent directly to the IDS warehouse, where it would be warehoused and eventually delivered to the customer's home. In the case of damaged furniture, IDS would report to TFI and allow them to determine whether to have the furniture repaired, replaced, or refunded, and how to dispose of any unfixed pieces. In certain limited cases, such as customer returns, IDS would recollect furniture from the customers.[19]

As of April 1, 2010, IDS entered into the Warehouse and Home Delivery Service Agreement with TRI and Debtor HDM Retail, Inc. to provide warehouse services for the Debtors (the "Agreement").[20] The Agreement is governed by North Carolina law.[21] Provisions in the Agreement limit amendments or modifications to those made in writing. A waiver provision also stipulates that failure of any party to require performance shall "not affects its right to enforce the same … [n]o waiver by either party of the breach of any provision of this Agreement, whether by conduct or otherwise, shall be deemed to be a continued waiver thereof."[22]

---

[19] *Id.* at A0007 (*Graham Dec.*, ¶ 18).

[20] D.I. 66, A0003-4 (*Graham Dec.*, ¶ 9). The relationship of Debtor HDM Retail, Inc. to the Thomasville Debtor Group is not material for this Motion as Plaintiff only seeks recovery for payments made by TFI. *See* D.I. 73, n. 3; D.I. 77, ¶ 8.

[21] D.I. 67, A0483, 87 (*Agr.*, ¶¶ 6A, 20).

[22] D.I. 69, A0906 (*Agr.*, ¶¶ 16-17).

Provisions in the Agreement also limits use of the inventory.  IDS does not have a right to offset or make a claim against the Debtors' inventory.  Furthermore, "[n]othing in this Agreement shall be deemed to have transferred to I.D.S. the right of property or title on the [TRI] inventory.  Until delivered to the customer, title to the [TRI] inventory shall remain with [TRI] and I.D.S. shall not pledge, grant a security in or lien, loan, or part with the possession of the inventory other than in accordance with this Agreement."[23] The Agreement was amended in March 2013 to account for certain rate changes.[24]

On November 2, 2012, IDS President Howard Dell signed an additional letter agreement[25] on behalf of IDS that acknowledged, among other things, that the Debtors' inventory was "not covered by a document, as defined in the Uniform Commercial Code."  IDS also "disclaim[ed] any and all ownership rights and interests in the [Debtors' inventory]," including holding the inventory "for the benefit of any party other than the [Debtors]."[26]

As part of services under the Agreement, payments to IDS came from or through either TFI or Furniture Brands via ACH.[27]  The Agreement stipulated net 30 payment

---

[23] D.I. 67, A0477 (*Agr.*, ¶ 4D); *see also id.* at A0483 (*Agr.*, ¶ 6A) ("… I.D.S. shall have no right of offset or claim to [TRI's] inventory under this Agreement").

[24] D.I. 71, A1291 (*Dell Dep.*, 183:5-184:24).

[25] The letter agreement is signed by Howard Dell in his capacity as President of "Innovative Delivery Service."  However, Dell was not President of any company with such a name at the time of the letter agreement.  Dell did form a company called "Innovative Delivery Services" in December 2016, during the pendency of this litigation.  *See* D.I. 71, A1321-22 (*Dell Dep.*, 304:13-309:9) ("Q. Did you form this company in December of 2016? A. Apparently").

[26] D.I. 67, A0500 (*Letter Agr. re: Security Interest in Assets of Furniture Brands International, Inc.*).

[27] *See* D.I. 70, A0985-A1183 (*Schnitzer Dec.*, Exh. J).

terms.[28]  Deliveries of goods were typically "billed the following Monday" after delivery, and payment followed "as early as five days, fifteen days, sometimes never" after billing.[29]  The payment and invoicing practice continued in this manner for 3 ½ years and covered over 200 payments and 3,500 invoices, until the last payment before the ninety days prior to the Petition Date (the "Preference Period").[30]

IDS sent invoices and documents to the name of "Thomasville Home Furnishings," as opposed to TFI or TRI.[31]  Dell noted that whether or not the payments came from "Thomasville Furn, not Thomasville Retail" was of little consequence to IDS.[32]  In addition, Dell testified several times that IDS did business and made an agreement with a company titled "Thomasville Furniture Industries, Inc."  He also referred to his relationship with Debtors in emails as with "Furniture Brands" and "Thomasville Furniture."[33]

---

[28] D.I. 67, A0474-97 (*Agr.*).

[29] D.I. 71, A1299-1301 (*Dell Dep.*, 218:22-219:7, 225:20-226:10).

[30] D.I. 70, A0985-1183 (*Schnitzer Dec.*, Exh. J).

[31] *See* D.I. 71, A1184-A1229 (*Schnitzer Dec.*, Exh. K).

[32] *Id.* at A1265 (*Dell Dep.*, 84:2-13):

> Question: Did you care that it said Thomasville Furn, not Thomasville Retail?
>
> Answer: I don't care.
>
> Question: Why don't you care?
>
> Answer: It said Thomasville.
>
> Question: And that's good enough?
>
> Answer: And that was—I don't know what "good enough" means, but the intent was obvious, that they were making a payment for Thomasville.

[33] *Id.* at A1254, 1268-70 (*Dell Dep.*, 96:6-97:6).

*3. The Transfers*

The Motion identifies thirty-three transfers made to the Defendant worth $860,583.87 in dispute.[34]    All relevant Transfers were made from a Wells Fargo disbursement account held in the legal title of TFI.[35]    All Transfers were made between June 11, 2013 and September 9, 2013, or within the Preference Period.[36]

*i. Pressure Payments*

Plaintiff separately discusses the payment history behind the $300,320.37 wire payment on August 28, 2013 as well as the five ACH payments made between August 28th and September 5th totaling $177,633.43 (the "Pressure Payments").

As early as August 21, 2013, Dell expressed concerned over the "large amount due [from Thomasville Debtor Group] that is over 30 days old," as well as "the current financial stability of Furniture Brands."    Given the circumstances, he suggested agreeing to "new terms."    Dell noted that "[i]n order for IDS to continue [the] current services, Furniture Brands need[ed] to provide immediate payment of balances that [were] over 30 days … by 12:00 PM EST, Friday, August 23, 2013."    If not, Dell threatened to "discontinue service immediately."[37]

---

[34] D.I. 65, ¶ 3.  As stated *supra*, n. 3, the Motion includes an additional transfer not listed explicitly in the complaint.  The Defendant was not given sufficient notice of this particular transfer, consequently the additional transfer is excluded from the analysis below.

[35] *See* D.I. 69, A0792-93 (*Schnitzer Dec.* Exh. H: Supp. Admission Responses, Nos. 1 and 2).

[36] D.I. 66, A0010-A0460 (*Graham Dec.*, Exh. A).

[37] D.I. 67, A0471-72 (*E-mail from H. Dell (IDS) to C. Scott (Thomasville) (Aug. 21, 2013 11:41 AM))*.

In the time leading up to this deadline, Dell continued to send emails asking for updates on the requested payment.  On August 22, Dell stated that "a minimum of $300,000 [had to be] wired to our bank account" by the deadline.  The morning of August 23, Dell once again emailed Debtors to remind them he had not received payment, pointing out as well "the lead story in the WSJ is that [Furniture Brands] has hired a turnaround/restructuring firm."  Immediately after the deadline imposed by Dell, he sent an email stating IDS "ceased performing warehousing and home delivery services." Customers were advised that deliveries could not be scheduled for that day, delivery trucks with Thomasville furniture were "ordered to park … and await instructions from Corporate IDS," and service centers were told "not [to] receive any additional product for Furniture Brands."  Thomasville Debtor Group implored IDS for a three-hour extension, which was granted, contingent upon successful wire of the funds by 3:00 PM. Debtors also suggested making the payment by ACH, but IDS responded by forwarding on wire instructions.[38]

Debtors wired IDS $300,320.37 shortly after receiving the wire instructions from Dell, in payment of 129 invoices.  In addition, Debtors made an ACH payment in the amount of $60,905.27.[39]   Debtors made another ACH payment of $116,728.16 on

---

[38] *Id.* at A0463-0470 (*E-mail from H. Dell (IDS) to E. Singer (FBN) (August 23, 2017 12:14 PM)*; and *E-mail from H. Dell (IDS) to E. Singer (FBN) (August 23, 2017 12:28 PM)*).

[39] D.I. 66, A0031 (*Wire: 8/23*); *see also id.* at A0037 (*ACH Payments*).

September 5th, which IDS responded to by asking for further payment on threat of an ultimatum.[40]  On September 9, 2013, Debtors wired an additional $33,271.84 to IDS.[41]

## ANALYSIS

### A.  Legal Standard for Summary Judgment

Under FED. R. CIV. P. 56, made applicable here by FED. R. BANKR. P. 7056, summary judgment is appropriate when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[42]  The movant always bears the initial burden of demonstrating the absence of a genuine issue of material fact.[43]

When asserting whether "a fact cannot be or is genuinely disputed," a party "must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers or other materials."  Alternatively, a party can show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[44]

At the summary judgment phase, the court does not "weigh the evidence and determine the truth of the matter."  Rather, the court determines "whether there is a

---

[40] D.I. 67, A0507 (*E-mail from H. Dell (IDS) to E. Singer (FBI) (Sept. 5, 2013 9:43 PM)*) ("This not going to cut it. Need an additional 100K to keep going … Otherwise, we will need to cut our losses now and throw in the towel").

[41] D.I. 66, A0044 (*Electronic Debits: 9/09*).

[42] FED. R. CIV. P. 56(a).

[43] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[44] FED. R. CIV. P. 56(c)(1)(A)-(B).

genuine issue for trial."[45]   A material fact is one which "could alter the outcome" of the case.  The fact is genuine when it is "triable," i.e. when reasonable minds could disagree on the result.[46]  In deciding a motion for summary judgment, all factual inferences must be viewed in the light most favorable to the non-moving party.[47]   The court in its assessment "need only consider the cited materials" in its analysis, but may also look elsewhere in the record.[48]

Once the movant presents sufficient support for the motion, the burden shifts to the non-moving party to show the continued existence of genuine issues of material fact.[49] It does not suffice to assert the "mere existence of some alleged factual dispute between the parties," instead a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[50]  Likewise in a bench trial where the judge is the ultimate trier of fact, an issue is genuine if a reasonable factfinder could find for the nonmovant on the evidence.[51]  If there is a complete failure of proof concerning an essential element of the nonmoving party's case, FRCP 56(c) renders all other facts immaterial and mandates a ruling in favor of the movant.[52]

---

[45] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[46] *Id.* at 210 (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 301 (3d Cir. 1995)).

[47] *Matsushita Electric Industrial Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

[48] FED. R. CIV. P. 56(c)(3).

[49] *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996).

[50] *Anderson*, 477 U.S. at 247-48.

[51] *Leonard v. General Motors Corp.* (*In re Headquarters Dodge, Inc.*), 13 F.3d 674, 679 (3d Cir. 1993).

[52] *Celotex Corp.*, 477 U.S. at 317.

### B. Avoidance of Preferential Transfers

The Liquidating Trustee seeks the avoidance of preferential transfers under §§ 547 and 550.  A trustee can only avoid a preferential transfer if it satisfies the § 547(b) elements; the exclusion of even one prevents avoidance.[53]  The Supreme Court has authorized trustees to avoid "any transfer of the debtor in property *if* five conditions are satisfied and *unless* one of seven exceptions defined in subsection (c) is applicable."[54] Plaintiff maintains the burden of proving each element to receive summary judgment.[55]

The conditions are as follows:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property —
    (1)  to or for the benefit of a creditor;
    (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3)  made while the debtor was insolvent;
    (4)  made —
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if —
        (A)  the case were a case under chapter 7 of this title;
        (B)  the transfer had not been made; and
        (C)  such creditor received payment of such debt to the extent provided by the provisions of this title.[56]

The subsections *infra* discuss each of the elements in turn.

---

[53] *Stanziale v. Southern Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 518 B.R. 269, 277 (D. Del. 2014) (citing *Waslow v. The Interpublic Group of Cos., Inc. (In re M Group, Inc.)*, 308 B.R. 697, 700 (Bankr. D. Del. 2004) and *In re IT Grp., Inc.*, 331 B.R. 597, 601 (Bankr. D. Del. 2005)).

[54] *Union Bank v. Wolas* 502 U.S. 151, 154 (1991) (italics in original) (citing 11 U.S.C. § 547(b)) (internal quotations omitted).

[55] *Id.* § 548(b).

[56] *Id.* § 547(b).

1.  *Interest of the Debtor in Property*

To qualify as an avoidable preference, a transfer must be an "interest of the debtor in property."[57]  While the Bankruptcy Code does not define the term, the Supreme Court has interpreted it to mean "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[58]  As a result, the term is largely co-extensive with the § 541 definition of "property of the estate," including "all legal or equitable interests of the debtor in property as of the commencement of the case."[59]  Courts first look to state law to determine whether a legal and equitable interest exists, before applying bankruptcy law to determine an interest's inclusion in the estate.[60]  The crucial question in deciding whether to include property within the estate is to see whether the transferred funds "diminished the resources from which the debtor's creditors could have sought payment."[61]

It is "well-settled case law" that any bank accounts under the legal title of the debtor, as well as any deposits in such accounts credited to the debtor, are presumptively considered property of the debtor's estate.[62]  This presumption holds even in cases where

---

[57] *See Radnor Holdings Corp. v. PPT Consulting LLC* (*In re Radnor Holdings Corp.*), 2009 WL 2004226, at *7-8 (Bankr. D. Del. 2009).

[58] *Begier v. IRS*, 496 U.S. 53, 58 (1990).

[59] *Slobodian v. IRS* (*In re Net Pay Solutions, Inc.*), 822 F.3d 144, 154 (3d Cir. 2016) (citing *Begier v. IRS*) (internal quotations omitted).

[60] *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also Majestic Star Casino v. Barden Development (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 751 (3d Cir. 2013) (citing *In re Brannon*, 476 F.3d 170, 176 (3d Cir. 2007)).

[61] *In re Southmark Corp.*, 49 F.3d 1111, 1117 (5th Cir. 1995).

[62] *In re Washington Mutual, Inc.*, 442 B.R. 314, 330 (Bankr. D. Del. 2011) (citing *Amdura Nat'l Distribution Co. v. Amdura Corp., Inc. (In re Amdura Corp.)*, 75 F.3d 1447, 1451 (10th Cir. 1996), also *In re Meadows*, 396 B.R. 485, 490 (6th Cir. BAP 2008), and five other compiled cases); *see also* 4 COLLIER ON BANKRUPTCY ¶ 541.09

the account contains commingled funds. [63]  In the case of a cash management account, with proper bookkeeping allocations, "the holder of all indicia of control is the holder of the interest."[64]  Generally parent and subsidiaries companies have no claim on the assets of the other unless a party seeks to pierce the corporate veil or substantively consolidate two entities.[65]

The Liquidating Trustee asserts that both TFI and TRI have an interest in the Transfers.  Defendant admits that an interest exists as to TFI, but does not admit the same for TRI.  In support of the interest of TFI, the Liquidating Trustee notes that the Transfers came from a bank account in the legal title of TFI, and deposited funds are presumptively part of the estate of the account titleholder.[66]

As for TRI, it is argued that the interest in the Transfers arose through the Debtors' cash management system, as the deposit accounts owned by TRI were swept into the system and returned to IDS through TFI's disbursement account.  However, no evidence was presented to show that the Transfers were earmarked from the TRI deposit accounts, nor does the evidence show that TRI exercised any indicia of control over the funds once

---

(15th ed. 2009) ("deposits in the debtor's bank account become property of the estate under section 541(a)(1)").

[63] *In re Southmark Corp.*, 49 F.3d at 1116-17; *see also In re Radnor Holdings Corp.*, 2009 WL 2004226 at *2.

[64] *Enron Corp. v. Rexel Southern Electrical Supply (In re Enron Corp.)*, 2006 WL 2385194 (Bankr. S.D.N.Y. June 2, 2006).

[65] *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 373-77 (Bankr. S.D.N.Y. 1998).

[66] *See* D.I. 69, A0792-93 (*Schnitzer Dec.*, Exh. H: Supplemental Admissions Responses, No. 1 and 2).

the Transfers left the deposit accounts. TRI lost legal title over the funds once they were swept.[67]

Consequently, although the parties have admitted TFI's interest, the Court finds that TRI has no interest in the Transfers in satisfaction of § 547(b).

### 2. Transfer to or for the Benefit of a Creditor; for or on Account of Antecedent Debt

The next two elements, under §§ 547(b)(1)-(2), require that a transfer be "to or for the benefit of a creditor" and "for or on account of an antecedent debt."

This first element has been loosely construed by courts.[68] Under § 101(10), a "creditor" is any "entity that has a claim against the debtor,"[69] where a "claim" is a "right to payment,"[70] and where a "payment" is a "performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation."[71] The second element, under § 547(b)(2), requires a transfer to be "for or on account of an antecedent debt." A debt is antecedent if it was incurred before the debtor made the allegedly preferential transfer.[72] A debtor incurs a debt "on the date upon which the debtor first becomes legally bound to pay."[73]

---

[67] Liquidating Trustee's view that the Court should find TRI's interest in the Transfers because the Defendant did not explicitly counter its argument is improper, as the Liquidating Trustee has failed to meet its initial burden in proving that TRI has an interest.

[68] *In re CVEO Corp.*, 327 B.R. 210, 214 (Bankr. D. Del. 2005).

[69] 11 U.S.C. § 101(10).

[70] *Id.*

[71] *In re Bake-Line Grp., LLC,* 359 B.R. 566, 577 (Bankr. D. Del. 2007) (quoting BLACK'S LAW DICTIONARY 1165 (8th ed. 2004)).

[72] *Peltz v. New Age Consulting Servs., Inc.*, 279 B.R. 99, 102 (Bankr. D. Del. 2002).

[73] *Id; accord In re CVEO Corp.*, 327 B.R. at 214.

Certain cases have found a creditor-relationship and an attaching antecedent debt in transactions involving third-parties, albeit on contractual hooks.[74]   In particular, as noted in *Computer Universe*, "to the extent [a defendant] claims that reasonably equivalent value passed to [a subsidiary] by virtue of the extinguishment of its debt to its parent, [the defendant] necessarily concedes there has been a novation."  In such a circumstance, the defendant is "substituted as the creditor."[75]  As a result, a creditor-defendant cannot simultaneously attempt to shield itself from a § 548 attack by claiming payment of a debt *and* shield itself from a preference action by arguing it did not receive a transfer on account of an antecedent debt.[76]

As a question of contract interpretation, however, finding "a novation is a matter of state law."[77]   In North Carolina, courts may only find a novation where "the intention of the parties to effectuate a novation [is] … clear and definite, for novation is never to be presumed."[78]   Whether or not a novation is clear depends on evidence of the parties' intents.[79]  But when limited terms in an agreement are merely substituted, "the making

---

[74] *See Ross v. Penny (In re Villa Roel, Inc.)*, 57 B.R. 879, 881 (Bankr. D.D.C. 1985) (finding defendant landlords were creditors of the debtor where a debtor receives the benefit of possession of the premises and maintained rent payments, despite no formal assignment of the lease to the debtor); *cf. Doyle v. Paolino (In re Energy Savings Ctrs., Inc.)*, 61 B.R. 732, 733-34 (E.D. Pa. 1986) (finding no preference where there is no antecedent debt of the debtor, but subsequently finding a fraudulent transfer).

[75] *Hall & Arthur Young & Co. (In re Computer Universe, Inc.)*, 58 B.R. 28, 31-32 (Bankr. M.D. Fla. 1986).  The reasonably equivalent value analysis is further considered *infra*, with the fraudulent transfer claim.

[76] *Miller v. Kane (In re Del Grosso)*, Bankr. No. 89B06606, 1992 WL 280788, at *n.6 (Bankr. N.D. Ill. Sept. 21, 1992) ("[c]ase law typically disallows a defendant to simultaneously maintain that it is insulated from a section 548 attack because a transfer was in payment of a debt and claim under section 547 that it did not receive a transfer on account of an antecedent debt").

[77] *Fultz v. Fultz (In re Fultz)*, 232 B.R. 709, 722 (Bankr. N.D. Ill. 1999).

[78] *Kirby Bldg., Inc. v. McNiel*, 327 N.C. 234, 243 (1990) (citing *Wilson v. McClenny*, 262 N.C. 121, 130 (1964)).

[79] *See Tomberlin v. Long*, 250 N.C. 640, 644 (1959).

of a second contract … does not necessarily abrogate the former contract between the parties …[such a] contract was not [a novation] but *modified*."[80]

Similarly, whether a contract is modified, supplemented, or qualified is a matter of state law.[81]  A "course of performance or course of dealing between the parties … is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."[82]  The North Carolina U.C.C. provides, "except as otherwise provided in subsection (f) of this section, the express terms of an agreement and any applicable course of performance, course of dealing … must be construed whenever reasonable as consistent with each other.  If such a construction is unreasonable: (1) Express terms prevail …"[83]  Subsection (f) states, "[s]ubject to G.S. 25-2-209, a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of

---

[80] *Zinn v. Walker*, 87 N.C. App. 325, 336 (1987) (citing *Turner v. Turner*, 242 N.C. 533 (1955)) (emphasis in original).

[81] *Cf. In re Larson, Inc.*, 314 B.R. 296, n. 3 (Bankr. D. Del. 2004) ("The … Agreement, which both parties intended to govern their relationship, has a choice of law provision stating that Georgia law governs").

[82] NC G.S. § 25-2-303(d); *see* U.C.C. § 1-303(d).  "[C]ourse of performance" is "a sequence of conduct between the parties to a particular transaction that exists if: (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection."  *Id.* § 1-303(a); *see* NC G.S. § 25-1-303(a).  "[C]ourse of dealing" is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fair to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  *Id.* § 1-303(b); *see* NC G.S. § 25-1-303(b).

[83] NC G.S. § 25-1-303(e); *see Ziptronix, Inc. v. Ostendo Technologies, Inc.*, No. 5:11-CV-160-FL, 2013 WL 1246741, at *6 (E.D. NC 2013) (quoting *Snyder v. Freeman*, 300 N.C. 204, 215 (1980)) ("a party's course of dealings] cannot obtain an interpretation contrary to the express language of … [the] contract by asserting it had a contrary intention or did not mean what it said").

performance."[84]   Yet "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded …"[85]

A moving party can still prove that a written contract may be modified without new consideration or written mutual consent in certain situations, even where the agreement only allows modification in writing.[86]  Continued acceptance of performance by an innocent party constitutes a valid waiver of a contractual provision, consequently promissory estoppel does not require additional consideration to effect a binding agreement.[87]  Mutual consent is likewise evidenced "by conduct which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived, even though the instrument involved provides that only written modifications shall be binding."[88]

Both parties accept that IDS was a creditor of TRI. Rather, Defendant's position holds that because the Agreement was made with TRI and HDM Retail, Inc., those are the only two parties that IDS could be a creditor of per the Agreement.  Since IDS was not

---

[84] NC G.S. § 25-1-303(f).

[85] NC G.S. § 25-2-209(2).

[86] *Clifford v. River Bend Plantation, Inc.*, 312 N.C. 460 (1984); *see Lambe-Young, Inc. v. Cook*, 70 N.C. App. 588, 320 S.E.2d 699 (1984) (moving party has the burden of proof on showing modification).

[87] *Wheeler v. Wheeler* 299 N.C. 633, 639 (1980) (allowing for waiver of a contractual provision without consideration if the waiving party is innocent, the breach does not involve a total repudiation of the contract, the innocent party is aware of the breach, and the innocent party intentionally waives his right to repudiate through his continued performance); *see U.S. Cold Storage, Inc. v. City of Lumberton*, No. 7:00-CV-18-F(1), 2001 WL 34149709, *10 (E.D. NC August 29, 2001) (citing *Clifford*, 323 S.E.2d at 27 (N.C. 1984)).

[88] *Son-Shine Grading, Inc. v. ADC Const. Co.*, 68 N.C. App. 417, 422 (1984) (citing *W.E. Garrison Grading Co. v. Piracci Const. Co., Inc.*, 27 N.C. App. 725 (1975)).

a creditor of TFI, Defendant holds that the Transfers cannot have been to the benefit of a

creditor on account of an antecedent debt.

The Liquidating Trustee challenges whether the Defendant can simultaneously

maintain that there is no creditor or antecedent debt, yet claim there is reasonably

equivalent value through the satisfaction of a debt for § 548 purposes.  As stated *supra*,

courts have looked at such attempts skeptically. Liquidating Trustee submits that IDS

became a creditor of TFI either by course of performance or dealings, pursuant to U.C.C.

§ 1-303, supplementing or qualifying the terms of the Agreement.   Liquidating Trustee

points to the intertwined nature of the Thomasville Debtor Group in making its "course

of performance" argument. Plaintiff argues that because IDS invoiced "Thomasville

Group" as opposed to TRI and because the invoices were continuously paid by TFI, IDS

owed its debt to the entire Thomasville Debtor Group.  Defendant counters that any

"waiver or modification of any term inconsistent with the course of performance" had to

be in writing, as stipulated in the Agreement pursuant to NC G.S. § 25-1-303(e).[89]

According to the Agreement, "amounts invoiced [ ] shall be paid by Retailer [i.e.

TRI] thirty (30) days from the date of receipt of said invoice."[90]  The Agreement contains

provisions that prevent amendment or modification without a written agreement.  It

further contains a waiver provision wherein failure of any party to require performance

shall "not affects its right to enforce the same … [n]o waiver by either party of the breach

---

[89] D.I. 67, A0487 (*Agr.*, ¶ 16).

[90] D.I. 69, A0902 (*Agr.*, ¶ 6A).

of any provision of this Agreement, whether by conduct or otherwise, shall be deemed to be a continued waiver thereof."[91]

The Agreement lists TRI as the party that is to make payments on the invoices submitted by IDS. That the Agreement already contained payment parties demonstrates that the above dispute is not over whether to supplement the contract, but whether to modify it. This also sits with North Carolina law rejecting novation and finding modifications in cases where only certain contract terms are in dispute. However, even if the Agreement prevented unwritten modifications, it may still be modified under certain limited circumstances. The parties continued performance of the contract despite TFI making payments; indeed, IDS made no attempt to distinguish between TFI, TRI, or the rest of the Furniture Brand entities. Given the North Carolina cases cited above and the evidence of continued performance given by the Liquidating Trustee, a modification may be appropriate in this instance.

However, since the above inquiry is a fact-driven one that could move in either direction, the Court finds a dispute of material fact as to whether the Transfers were to or for the benefit of TFI as a creditor on account of an antecedent debt.

### 3. Insolvency

A debtor must be insolvent when the transfers are made in order for them to be preferential. Pursuant to § 547(f), a debtor is presumed insolvent within the ninety days

---

[91] *Id.* at A0906 (*Agr.*, ¶¶ 16-17) ("This Agreement may be amended or modified, and any of the terms or provisions hereof may be waived, but only by a written instrument, executed by both parties").

immediately preceding the Petition Date.[92]  If the Defendant "fails to present evidence to rebut the presumption, [Plaintiff] is entitled to rely on the presumption to establish that it was insolvent."[93]  IDS has admitted to the element of insolvency and has not produced evidence in rebuttal.  As a result, this element has been met.

### 4.  *Within the Preference Period*

Fourth, a preferential transfer must occur within the voidable Preference Period, i.e. at least on or within ninety days of the Petition Date, extending as far back as within one year of the Petition Date for insiders.  The Preference Period in the extant case lasted from June 11, 2013 to September 9, 2013.  All the Transfers occurred in that timeframe. IDS further admitted to this element in its responses to admission requests.[94] This element has been met.

### 5.  *Greater Recovery than in Chapter 7*

Lastly, an avoidable preference must enable a creditor to receive more than if the transfer had not been made, and if the creditor received payment of such debt to the extent provided by the provisions of Title 11.  The determination is made based on "the actual effect of the payment as determined when bankruptcy results,"[95] or whether IDS

---

[92] *See also Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, n.4 (3d Cir. 1994); *see also Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D. Del. 2002) (noting the burden of bringing forward evidence to rebut this presumption is on the party against whom the preference action is directed towards).

[93] *In re Lids Corp.*, 281 B.R. at 540.

[94] D.I. 69, A0785-804 (*Schnitzer Dec.*, Exh. H).

[95] *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229 (1936).

would have received a 100% payout in a Chapter 7 liquidation.[96]  If so, no preference can

be avoided; if not, the requirements of § 547(b)(5) are met.[97]  As a general matter, nearly

all transfers to an unsecured creditor will satisfy this test unless the debtor's estate is

solvent in Chapter 7.[98]

Plaintiff contends that IDS's debt with the Thomasville Debtor Group is an

unsecured claim that would receive between 5.3% and 7.2% recoveries under the Plan.[99]

As a result of the Plan, there can be no dispute that unsecured creditors will receive less

than 100% distribution on their claim.[100]  Defendant challenges the Plaintiff's premise that

the debt is unsecured debt, and instead claims that certain liens exist on the Debtors'

property that make IDS a secured creditor.

### i. Potential Liens

To the extent IDS held an inchoate lien on the Debtors' property, it "is a secured

creditor."[101]  If a creditor is fully secured then payments made to said creditor do not

constitute a preferential transfer.[102]  However, "if a given [d]efendant did not possess a

---

[96] See In re Vaso Active Pharm., Inc., 500 B.R. 384, 394 (Bankr. D. Del. 2013) (quoting In re Lewis W. Shurtleff, Inc., 778 F.2d 1416, 1421 (9th Cir. 1985)).

[97] See In re AmeriServe, 315 B.R. at 32.

[98] George M. Treister et al., Fundamentals of Bankruptcy Law §4.03(c)(1)(G) (6th ed. 2006).

[99] See A0706-10 (Schnitzer Dec., Exh. D: Second Amended Plan, Distribution Model).

[100] In re AmeriServe, 315 B.R. at 33.

[101] Golfview Developmental Ctr., Inc. v. All-Tech Decorating Co. (In re Golfview Developmental Ctr., Inc.), 309 B.R. 758, 769 (Bankr. N.D. Ill. 2004) (citing In re Bilinski, Civ. A. 96-4268, 1998 WL 721083 at *3 (E.D. Pa. Oct. 9, 1998)).

[102] See Hayes v. DMAC investments, Inc. (In re RDM Sports Group, Inc.), 250 B.R. 805, 815 (Bankr. N.D. Ga. 2000) (citing, among other cases, Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.), 990 F.2d 551, 554 (10th Cir. 1993), Ray v. City Bank and Trust Co. (In re C-L Cartage Co.), 899 F.2d 1490, 1493 (6th Cir. 1990), and Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030, 1034 (5th Cir. 1987)).

lien at the time it received payment, the 'secured payments' exception to § 547(b)(5) would not apply."[103]  In reviewing the secured status of a creditor's interest, the Court must look to state law.[104]

North Carolina applies the doctrine of *lex loci delicti*, consequently any liens the Defendant claims must conform to the laws of the state in which the property resides.[105] The relevant states here are California, Arizona, Georgia, and North Carolina.[106]

All four states recognize a U.C.C. warehouse and carrier's lien.[107]  A warehouse and common carrier's lien is established to goods based on either warehouse receipts or a storage agreement, in the former case, or a bill of lading, in the latter case.[108]  The warehouse lien can be further extended to include other goods that are not charges for storage or transportation yet are still in the defendant's possession, but for that to be the case the lienholder must have expressly reserved such right in writing.[109]  In order to maintain the liens, the defendant must hold possession of the goods, otherwise the lien

---

[103] *In re J.A. Jones, Inc.*, 361 B.R. 94, 100 (Bankr. W.D.N.C. 2007).

[104] *In re Golfview Developmental Ctr., Inc.*, 309 B.R. at 767 (citing *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329 (1993)).

[105] *Charnock v. Taylor*, 223 N.C. 360, 361-62 (1943).

[106] D.I. 73, n. 5; D.I. 65, n. 8.

[107] *See, e.g.*, N.C. G.S. § 25-7-209; A.R.S. § 47-7209; Cal. Com. Code § 7209; O.C.G.A § 11-7-209 (warehouse lien provisions). *See also* N.C. G.S. § 25-7-307; A.R.S. § 47-7307; Cal. Com. Code §7-307(a); O.C.G.A. § 11-7-307 (common carrier's lien).

[108] *See, e.g. id.* (U.C.C. provisions of these jurisdictions are the same in the provisions relevant here).

[109] N.C. G.S. § 25-7-209(a) ("if it is stated in the warehouse receipt or storage agreement that a lien is claimed for charges and expenses in relation to other goods, the warehouse also has a lien against the goods covered by the warehouse receipt or storage agreement … whether or not the other goods have been delivered by the warehouse").

will be considered released.[110]  Like the warehouse lien, any statutory or common law carrier's lien would be extinguished upon the relinquishment of the goods.[111]  Despite the above, any such lien rights may be properly waived by the parties.[112]

North Carolina also maintains a specific statutory artisan's lien, which applies to "any person who … alters, repairs, stores, services, treats, or improves personal property … in the ordinary course of business pursuant to an express or implied contract with an owner or legal possessor of the personal property."[113]  Pursuant to N.C. G.S. § 44A-3, "[l]iens conferred under this Article arise only when the lienor acquires possession of the property and terminate and become unenforceable when the lienor voluntarily relinquishes the possession of the property upon which a lien might be claimed …"  An artisan's lien can also be waived with the proper intent.[114]

Defendant contends that it held one of several possible liens: a U.C.C. warehouseman's lien; a U.C.C. and common law carrier's lien; and a North Carolina statutory artisan's lien.  Plaintiff asserts that any liens held by the Defendant were

---

[110] *See generally id.* at § 25-7-209(e).

[111] *In re World Imports, Ltd. Inc.*, 498 B.R. 58, 63 (Bankr. E.D. Pa. 2013) ("a carrier's lien requires possession of the goods"); *see also In re CFLC, Inc.*, 209 B.R. 508, 514-15 (9th Cir. BAP 1997) (citing *In re Lissner Corp.*, 98 B.R. 812, 819 (N.D. Ill. 1989)) ("common law also recognized a possessory lien in favor of the common carrier …a means of enforcing a carrier's lien was to retain possession of the property until the debtor was paid").

[112] *See Wachovia Bank Nat. Ass'n v. Superior Const. Corp.*, 213 N.C. App. 341, 348 (2011) (upholding use of lien waivers and applying general contract interpretation principles in assessing them).

[113] N.C. G.S. § 44A-2.

[114] *Ash Handkerchief Corp. v. Hickory Finishing, Inc. (In re Ash Handkerchief Corp.)*, 191 B.R. 588, 592-92 (Bankr. D. Del. 1996).

terminated by voluntary delivery, contractually waived, or at least limited to only those goods which were either transported or warehoused by the Agreement.

Despite the multiple liens in dispute here, IDS cannot claim any such liens given its prior contractual agreement with Debtors.  The Court should look to the Agreement in assessing the rights as to the relationship between the parties.[115]  The Agreement notes IDS has no "right of property or title" in Debtors' inventory, nor could IDS make any claim against TRI's inventory under the Agreement, nor could IDS "grant a security interest in or lien ... the inventory other than in accordance with this Agreement."[116] Defendant has made no argument to dispute the Liquidating Trustee's argument that this language amounted to a waiver of lien rights.

Furthermore, the 2012 letter agreement with IDS "disclaims any and all ownership rights and interests" in the Debtors' property.  As a further waiver of lien rights by the IDS, the letter agreement affirms the intent of the parties to waive lien rights and to prevent IDS from asserting a secured lien claim, despite the ability of the parties to change terms.[117]  To otherwise allow IDS to assert these liens would be in direct contravention of the terms established and reaffirmed by the parties.

In sum, the Liquidating Trustee has met its burden for the final § 547(b) element.

***

---

[115] *See* D.I. 73, p.8 (Defendant concedes in its statement of facts "[t]he parties' business relationship was governed by that certain Warehouse ... Agreement").

[116] D.I. 67, A0477 (*Agr.*, ¶¶ 4D, 6A).

[117] *See also Wachovia Bank Nat. Ass'n*, 213 N.C. App. at 348-49 (lien waiver interpretation should attempt to ascertain the intention of the parties upon execution).

The Liquidating Trustee has not fulfilled its burden as to all the elements for an avoidable preference under § 547(b).  As a result, the Court will grant summary judgment on the Motion, in part, as to those elements proven above.[118]  The Court however denies the Motion for the following three § 547(b) elements: (1) whether the Transfers are an interest of TRI in property; (2) whether the Transfers were to or for the benefit of TFI as a creditor, and (3) whether the Transfers were in satisfaction of an antecedent debt of TFI.

### C.  § 547(c) Affirmative Defenses

A transfer fulfilling § 547(b) may still be unavoidable if it qualifies for a § 547(c) exception.  The party "against whom recovery or avoidance is sought" bears the burden of proving any exception by a preponderance of the evidence.[119]  In a motion for summary judgment, the party seeking nonavoidance maintains the burden, whereas the plaintiff need only point to the absence of such proof to make its case.[120]

Against the Liquidating Trustee's assertion that IDS cannot establish any § 547(c) affirmative defense, Defendant responds that the Transfers were in the ordinary course of business, given for subsequent value, and made for a contemporaneous exchange of new value.  Each of these defenses is reviewed *infra*.

---

[118] *See Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 527 B.R. 178, 183 (Bankr. D. Del. 2015) (granting a summary judgment motion, in part, and denying, in part).

[119] 11 U.S.C. §§ 547 (g); *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 240 (Bankr. D. Del. 2010) (citing *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999)).

[120] *Id.* (citing *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990)).

### 1. *Ordinary Course of Business Defense*

The "ordinary course of business" defense balances the interests of the debtor and creditor, in order to "induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy."[121]  Under § 547(c)(2), a trustee may not avoid a transfer "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and [where] such transfer was (a) made in the ordinary course of business of the debtor and transferee, *or* (b) made according to ordinary business terms."[122]  In order to successfully apply the ordinary course exception, the creditor must prove by a preponderance of the evidence that the transaction between creditor and debtor meets two of the three subparts of § 547(c)(2).[123]

A transfer befitting the ordinary course of business exception must go toward paying a debt incurred by the debtor in the ordinary course of business of both parties.[124] Courts examine the underlying debt for "the normality of such occurrences in each party's business operations generally."[125]  Although neither party made representations as to this element, the Agreement provided the Thomasville Furniture Group's furniture

---

[121] *Forman v. Moran Towing Corp. (In re AES Thames, LLC)*, 547 B.R. 99 (Bankr. D. Del. 2016) (quoting *In re Molded Acoustical Products, Inc.*, 18 F.3d at 219).

[122] *Sass v. Vector Consulting, Inc. (In re Am. Home Mortgage Holdings, Inc.)*, 476 B.R. 124, 135 (Bankr. D. Del. 2012) (internal quotations omitted) (emphasis added) (citing 11 U.S.C. § 547(c)(2)(A)-(B)).

[123] *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 2010 Bankr. LEXIS 890 at *8 (Bankr. D. Del. 2010).

[124] 11 U.S.C. §§ 547 (c) (found in the introductory language).

[125] *Speco Corp. v. Canton Drop Forge (In re Speco Corp.)*, 218 B.R. 390 (Bankr. S.D. Ohio 1998); *cf. In re Archway Cookies*, 435 B.R. at 241 (finding the first prong of §547(c)(2) satisfied where debtor purchased goods made by the creditor for use in their industry, and where a two year business relationship existed).

supply business with warehousing, shipping, and repair services; all primary services provided by IDS.  The Court consequently finds that the debt was incurred in the ordinary course.

Defendant does not contend the Transfers were made according to "ordinary business terms," rather it is argued the Transfers were in the ordinary course of business between the parties.  After finding that the alleged payments were for a debt incurred in the ordinary course of business, courts "look for certain hallmarks to determine whether the transfers were not in the ordinary course of business."[126]  A determination whether a creditor has met its burden under § 547(c)(2)(A) is a subjective test that "contemplated the normal payment practice between the parties."[127]

Courts have found no one factor determinative in this analysis.[128]  Instead, a multitude of factors have been considered, including: (1) the length of time the parties engaged in the type of dealings at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the

---

[126] *In re Am. Home Mortgage Holdings, Inc.*, 476 B.R. at 135.

[127] *Id.*

[128] *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D. Del. 2010).

debtor's deteriorating condition.[129]  In situations where the parties have a long history of dealings, those dealings are the focus.[130]

A court must first look at "the length of the business relationship between Debtors and Defendant to determine if their relationship was of recent origin, as opposed to being cemented long before the onset of insolvency."[131]  In this case, the payment history between TFI and IDS extended back over three years and covered hundreds of payments.[132]  This more than satisfies as an ordinary course of dealings.

Next, a court must review the similarity of the Transfers to the payment history before the Preference Period (the "Historical Period").  In determining the ordinary course of dealings between parties, "[c]ourts place particular importance on the timing of payments."[133]  It is "well settled" in many jurisdictions that payments made beyond

---

[129] *In re Am. Home Mortg.*, 476 B.R.  at 135-36 (citing *In re Archway Cookies*, 435 B.R. at 242; *In re Hechinger Inv. Co of Delaware, Inc.*, 320 B.R. 541, 548-49 (Bankr D. Del. 2004)).

[130] *Forklift Liquidating Trustee v. Custom Tool & Mfg. Co.* (*In re Forklift LP Corp.*), 340 B.R. 735, 739 (D. Del. 2006) (citing *Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*, 321 B.R. 388, 392 (Bankr. D. Del. 2005)).

[131] *In re Archway Cookies* 435 B.R. at 243 (internal quotations omitted); *see In re Molded Acoustical Products, Inc.*, 18 F.3d at 225:

> Therefore, when the relationship in question has been cemented long before the onset of insolvency-up through and including the preference period-we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straitened [*sic*] debtor a fighting chance of sidestepping bankruptcy and continuing in business. Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help a business tend off an unwelcome voyage into the labyrinths of a bankruptcy.

[132] *See Troisio v. E.B. Eddy Forest Prods. Ltd. (In re Global Tissue, L.L.C.)*, 302 B.R. 808, 814 (D. Del. 2003) (affirming the bankruptcy court's holding that the parties' relationship of approximately 15 months was sufficient to establish ordinary course of dealings).

[133] *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, Case No. 06-10894, 2009 Bankr. LEXIS 1815, at *14 (Bankr. D. Del. July 9, 2009).

the parties' payment terms are considered as falling outside the ordinary course of business between the parties and presumed to be non-ordinary.[134]  As a result, Transfers made in the Preference Period should be deemed in the ordinary course of business when made within range of the Historical Period.[135]

Defendant argues that the Preference Period and Historical Period payment times are relatively close; only seven days slower than within the Preference Period.[136] However, in making this argument, Defendant uses the payment information provided in the Dell Affidavit.[137]  Dell's deposition revealed that the IDS payment history had multiple inaccuracies.[138]  In several instances, IDS's business records do not match the bank records made available in discovery.[139]  Furthermore, the removal of five, out of thirty-two, outlier payments from Defendant's analysis significantly distorts the findings.[140]  The Defendant's own analysis, including the outliers, shows the Preference Period payments were received 12 days slower on average, which is a more than 40%

---

[134] *In re TWA, Inc. Post Confirmation Estate*, 327 B.R. 706, 709 (Bankr. D. Del. 2005).

[135] *See Brothers Gourmet Coffees v. Armenia Coffee Corp. (In re Brothers Gourmet Coffees, Inc.)*, 271 B.R. 456 (Bankr. D. Del. 2002).

[136] D.I. 73, ¶ 40.

[137] *Id.* at ¶ 35.

[138] D.I. 71, A1301-20 (*Dell Dep.*, 223:22-224:8, 268:9-270:9, 299:3-300:20) ("Q. Are any of those payment dates here inaccurate? A. I believe so … I believe you know now that it's incorrect as well.")

[139] D.I. 66-71, A0184-1129 (*Schnitzer Dec.*, Exh. K) (IDS's business records show historical payments in 2010 and 2011 where IDS' bank records show no such payments).

[140] D.I. 73, ¶ 38 (the five payments were made a year or more from the invoice date).

increase from the Historical Period average.[141]  In contrast, removing the outliers shows only a 7 day greater delay in the Preference Period over the Historical Period.[142]

Ultimately, the payment history discrepancies and the difference in payment times with the outliers shows a dispute of material fact as to whether the Transfers are similar to the Historical Period.[143]

### i. Pressure Payments

In addition to the analysis *supra*, the Liquidating Trustee argues that certain Transfers made after IDS's credit hold (the "Pressure Payments") are outside the ordinary course as they were tendered through an unusual payment method, by unusual collection activity, and in an attempt to gain advantage of the Debtors' financial condition.

Changes in payment method can be a factor in the court's review of an ordinary course defense.[144]  For example, a change in payment method from check to wire, insisted upon by the debtor, weighs against holding the payments as within the ordinary course.[145]  Unusual collection activity in the Preference Period can similarly defeat an

---

[141] *Id.* at ¶ 41.

[142] *Id.* at ¶ 38, 40.

[143] Although there are doubts as to whether the business records provided by IDS are accurate enough to be reliable for this analysis, taking the evidence in the light most favorable to the Defendant, the inaccuracies are likely not so significant as to reject their entire analysis. *Cf. Berger Industries, Inc. v. Artmark Products Corp.*, 260 B.R. 639, n. 10 (Bankr. E.D.N.Y. 2003) (analyzing the *de minimis* value of two witness testimonies regarding payment demands in a preference action through "the cumulative thrust of their testimony," showing defendant requested to be paid).

[144] *In re AE Liquidation, Inc.*, Case No. 10-55543 (MFW) at *7 (citing *Logan Square E. v. Peco Energy Co. (In re Logan Square E.)*, 254 B.R. 850, 856 (Bankr. E.D. Pa. 2000)).

[145] *See Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods. (In re Hechinger Inv. Co. of Del., Inc.)*, 489 F.3d 568, 578 (3d. Cir. 2007).

ordinary course defense.[146]    Unusual actions constitute "unusual behavior designed to improve the lot of one creditor at the expense of the others."[147]    Thus, for example, communications that threaten actions previously not threatened, including imposing a hold on further delivery of goods, can constitute unusual collection activity.[148]

The first of the Pressure Payments was made via wire the day after Dell requested such payment "via wire."[149]    When Debtors suggested using ACH payment, the payment method used in prior dealings, IDS sent along wire instruments instead, which were used for the Pressure Payment. This form of insistence by IDS weighs against viewing the Pressure Payments as within the ordinary course.    Furthermore, the record is clear that IDS did, in fact, implement a credit hold.    Dell's email on August 23, 2013 detailed specific actions that IDS purported to have taken; the email's actions are written in the past tense.[150]    These actions had never been threatened upon the Debtors previously, and constituted a new form of communication with Thomasville Debtor Group.

Lastly, a creditor can take advantage of a debtor's financial condition through pressuring for payments.[151]    Such conduct includes "unacceptable debtor favoritism, as well as manifest selective preference period payments to designated creditors by troubled

---

[146] *In re AE Liquidation, Inc.*, 10-55543 at *7 (citing *Montgomery Ward, LLC v. OTC Int'l, Ltd. (In re Montgomery Ward, LLC)*, 348 B.R. 662, 678 (Bankr. D. Del. 2006)).

[147] *Molded Acoustical*, 18 F.3d at 225.

[148] *Menotte v. Oxyde Chem., Inc. (In re JSL Chemical Corp.)*, 424 B.R. 573, 582 (Bankr. S.D. Fla. 2010).

[149] D.I. 67, A0470 (*E-mail from H. Dell, August 22, 2013*) ("Yesterday, I had forwarded an email regarding serious delinquent invoices … As stated, IDS cannot continue to provide services past 12:00 PM EST, Friday, August 23, 2013, unless a minimum payment of $300,000.00 is wired to our bank account").

[150] *Id.* at A0463-65.

[151] *Am. Home. Mortg.*, 476 B.R. at 140.

debtors."[152]  A creditor's awareness of a debtor's financial condition can support a finding that the creditor attempted to collect a debt ahead of other creditors.[153]

Early on August 23, Dell sent an email to Debtors regarding nonpayment over a two-week period, pointing out "the lead story in WSJ is that FBN [i.e. Debtors] has hired a turnaround/restructuring firm."[154]  Dell went on to impose deadlines for the threatened credit freeze, which could be prevented only by the Debtors paying IDS specific sums.[155] The pressure from the credit hold threat, as well as knowledge of the insolvency, supports the view that IDS was taking advantage of the Debtors' financial position.

***

The Pressure Payments were done in conjunction with both unusual payment method and unusual collection activity, as well as signs of IDS taking advantage of the Debtors' financial position.  As a result, the Court finds the Pressure Payments outside the ordinary course, but finds a dispute of material fact regarding whether the ordinary course of business defense applies to the remaining Transfers.

2.  *Subsequent New Value*

Defendant next argues that the Liquidating Trustee may not avoid the Transfers since, pursuant to § 547(c)(4), the Transfers were given for subsequent new value.

---

[152] *Camelot Music, Inc. v. MHW Advertising & Public Relations Inc. (In re CM Holdings, Inc.)*, 264 B.R. 141, 154 (Bankr. D. Del. 2000).

[153] *Id.*

[154] D.I. 67, A0469 (*E-mail from H. Dell (IDS) to E. Singer (Debtors), August 23, 2013 8:29 AM*).

[155] *Id.* at A0462-65.

A trustee may not avoid a transfer made "to or for the benefit of a creditor" who gives "new value to or for the benefit of the debtor … on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."[156] "New value" is defined as "money or money's worth in goods, services or new credit … that is neither void nor voidable by the debtor or the trustee under any applicable law."[157] This exception "is intended to encourage creditors to work with companies on the verge of insolvency … [and] to ameliorate the unfairness of allowing the trustee to avoid all transfers made by the debtor to a creditor during the preference period without giving any corresponding credit for advances of new value."[158] As long as "the new value augments the estate in the same proportion as the value of the transfer," the estate, and consequently other creditors, are not harmed.[159]

This Court has previously held that a successful subsequent new value defense requires "two elements: (1) after receiving the preferential transfer, the creditor must have advanced 'new value' to the debtor on an unsecured basis; and (2) the debtor must not have fully compensated the creditor for the 'new value' as of the date that it filed its bankruptcy petition."[160] This rule has been dubbed the "subsequent advance approach" and has been employed by this Court on multiple occasions.[161] Under this approach, the

---

[156] *In re Proliance Int'l, Inc.*, 514 B.R. at 430 (quoting 11 U.S.C. § 547(c)(4)(B)).

[157] *Id.* § 547(a).

[158] *In re Proliance Int'l, Inc.*, 514 B.R. at 430 (quoting *Friedman's Inc. v. Roth Staffing Co. (In re Friedman's Inc.)*, Case No. 09-10161, 2011 WL 5975283 at *2 (Bankr. D. Del. 2011)).

[159] *Id.*

[160] *Id.* (quoting *In re Sierra Concrete Design, Inc.*, 463 B.R. at 307-08) (internal quotations omitted).

[161] *See id.*

Defendant's pressure exposure would be determined by "(i) the value of transfer … less (ii) the value of the services provided (i.e. new value provided); plus (iii) the value of [additional] transfer[s]."[162]

IDS contends that it provided additional services on credit to TRI after receipt of at least some of the Transfers, as provided in its new value calculations.[163]   The Liquidating Trustee counters that the business records used for the analysis are unreliable and cannot be used for a new value defense.  For instance, numerous invoices that IDS allege are new value and dated as of 2013 are curiously stamped as paid in 2011 and 2012, a year or two prior to the date of the Transfers.[164]

Although IDS's new value analysis contains several errors, looked at in the light most favorable to the non-moving party, those errors do not demonstrate a total rejection of new value given.  The Liquidating Trustee was only able to demonstrate problems with a handful of invoices, leaving the others capable of showing new value.[165]

However, given the factual inaccuracies in the subsequent new value analysis, the Court holds that a material dispute exists as to whether new value has been given, leaving details for another day.

---

[162] *Id.* (citing at *In re Vaso Active Pharm., Inc.*, 500 B.R. at 396-97).

[163] D.I. 74, Exh. D., *New Value Calculation*.

[164] *Compare* D.I. 74-5, p. 5 (*New Value Analysis: Invoice 25184-85*); D.I. 71, A1189-90 (*Invoices 25184 and 25185*) (*both* stamped as "PAID 08/30/2011").

[165] *See id.* at A1185-A1229 (*Exh. K: Invoices*).

3. *Contemporaneous Exchange for New Value*

Finally, Defendant alleges a contemporaneous exchange of new value defense under § 547(c)(1) as to the Pressure Payments.

To gain a contemporaneous exchange defense, the Defendant must prove "(1) it extended new value to the debtors; (2) the parties intended the new value and the disputed transfers to be contemporaneous exchanges; and (3) the exchanges were, in fact, substantially contemporaneous."[166]  Defendant, citing to an Eighth Circuit case, argues that the Pressure Payments were made in a contemporaneous exchange as evidenced by "the parties [discussion] about minimizing vendor's credit exposure."[167]

The Liquidating Trustee correctly notes, however, that *Payless Cashways* did not correspond to the current situation, where the Transfers were made for *prior* delivery of goods and services.  In *Payless Cashways*, the contemporaneous defense was appropriate because the credit exposure existed merely as a conduit to future services; the contemporaneous exchange defense applied as it "protects transactions that were meant to be cash transactions, but which unavoidably involved a brief extension of credit."[168] In contrast, the Pressure Payments were made in satisfaction of services completed between 11 to 417 days before payment.[169]  That the payments were done for past services

---

[166] *In re Vaso Active Pharm., Inc.*, 500 B.R. at 397 (citing *In re APS Holding Corp.*, 282 B.R. 795, 800 (Bankr. D. Del. 2002)).

[167] D.I. 73, ¶ 45; *see In re Payless Cashways, Inc.*, 306 B.R. 243, (8th Cir. BAP, 2004).

[168] *Id.* at 252 (contemporaneous exchange also supported by near instantaneous payment method, and testimony that most, if not all, payments were received before the arrival of goods).

[169] *See* D.I. 74-6, pp. 4-6 (*Exh. E-1*).

also fits with the Agreement's payment terms and IDS's practice of billing for deliveries 'the following Monday of that week" with payments coming after billing.[170]

The Court finds that there is no contemporaneous exchange for new value as to the Pressure Payments.

*** 

In conclusion, a material dispute exists as to whether the ordinary course of business exception and the subsequent new value exception apply to the Transfers. The Motion has failed to show that the Defendant will be unable to prove any of the § 547(c) defenses, as a result summary judgment is denied as to the alleged inapplicability of both the ordinary course of business and subsequent new value defenses. However, the Motion is granted for showing the inapplicability of the § 547(c)(1) contemporaneous exchange of new value defense.

### D.  Recovery Pursuant to § 550

Section 550 provides that "to the extent that a transfer is avoided under section 544, . . . 547, [or] 548 . . . of this title, the trustee may recover . . . the property transferred . . . from the initial transferee of such transfer or the entity for whose benefit such transfer was made."[171]

As stated above, a material dispute exists as to whether the Transfers are in fact preferential.   And as stated below, the Motion does not seek the full elements necessary in order to grant judgment on whether the Transfers are fraudulent.  The Court denies

---

[170] D.I. 71, A1299-1300 (*Dell Dep.*, 218:22-219:7).

[171] 11 U.S.C. § 550(a)(1).

summary judgment on § 550 grounds because the condition precedent to recovery has not been met.

### E.  Disallowance and Objection to Claims under § 502(d) and the Plan

Plaintiff's Motion seeks summary judgment for disallowance of the Transfers under § 502(d), and objection and setoff of the Transfers under the Plan.  Both issues only apply to the preference action since the Motion only asks for partial summary judgment as to the fraudulent transfer claim.

*1. Disallowance under § 502(d)*

A claim may be disallowed under § 502(d) if there is a judicial determination of a claimant having "received preferential transfer pursuant to § 547 or property recoverable pursuant to § 550."[172]  If a debtor or trustee has not yet received a judicial determination, the party cannot "avail itself of the benefits of section 502(d)."[173]

Because the Court denies the full request for summary judgment under §§ 547, 550, and 551, the Liquidating Trustee remains unable to provide evidence of a judgment deserving of § 502(d) relief.  The Court thus denies the Motion as to disallowance.

*2. Objection under the Plan*

Under Section 9.7 of the Plan, "any Claims held by Persons from which property is recoverable under section … 550 … of the Bankruptcy Code or by a Person that is a transferee of a transfer avoidable under section … 547, 548 … of the Bankruptcy Code,

---

[172] *Cohen v. TIC Financial Systems (In re Ampace Corp.)*, 279 B.R. 145, 162-63 (Bankr. D. Del. 2002).

[173] *Giuliano v. Mitsubishi Digital Electronics America, Inc. (In re Ultimate Acquisition Partners, LP)*, 2012 WL 1556098, at *3 (Bankr. D. Del. May 1, 2012) (citing *In re Lids Corp.*, 260 B.R. at 684) (internal quotations omitted).

shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code" until the settlement of the case and or entry of a "Final Order with respect thereto."[174]  A "Claim" is defined as "any right to payment from the Debtors … whether or not such right is reduced to judgment … disputed … or asserted."[175]  "Person" means, in relevant part, "an individual," and "Final Order" means "an order or judgment of a court …and has not been reversed, vacated, or stayed [without further possibility of appeal]."[176]

Defendant argues that the Transfers should be offset against the Claims under the Plan.  However, by the language of the Plan, any form of offset or objection to the Claim can only come with a "Final Order."   Because the Court only grants this Motion's summary judgment in part, and not fully as to any preference or fraudulent transfer claim, a Final Order will not have occurred that can lead to any disallowance of the Claim. The Court consequently denies the relief requested in the Motion.

## F.  Avoidance of Fraudulent Transfers

A trustee may avoid fraudulent transfers that improperly deplete a debtor's assets or dilute claims against those assets.[177]  A constructive fraudulent transfer must "show: (i) a transfer [from the debtor] within the applicable time period; (ii) [debtor's] insolvency; and (iii) a lack of reasonably equivalent value (or fair consideration)."[178]

---

[174] D.I. 68, A0691 (*Plan*, ¶ 9.7).

[175] *Id*. at A0653 (*Plan*, ¶ 1.24).

[176] *Id*. at A0657, 660 (*Plan*, ¶ 1.61, 1.94).

[177] 5 COLLIER ON BANKRUPTCY, 548.01.

[178] *Charys Liquidating Trust v. McMahan Securities Co., L.P. (In re Charys Holding Co., Inc.)*, 443 B.R. 628, 636 (Bankr. D. Del. 2010).

The Liquidating Trustee contends that, to the extent TFI was not the Debtor who incurred the debt, IDS received the Transfers for less than reasonably equivalent value under § 548 and 550.   If so, the Liquidating Trustee asks the Court to grant partial summary judgment as to the first fraudulent transfer element under § 548(a)(1)(B)(i), and to allow for further discovery to prove insolvency under (B)(ii).

### 1.   *Reasonably Equivalent Value*

The Bankruptcy Code does not define "reasonably equivalent value," but the Third Circuit has held that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"[179]  Any determination of reasonably equivalent value must be fact-driven and viewed through the "totality of the circumstances, taking into account the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arm's length."[180]

This Court follows a two-step approach, first looking to whether "based on the circumstances that existed at the time of the transfer [or obligation] it was 'legitimate and reasonable' to expect some value accruing to the debtor."[181]   "Second, if the court finds that the debtor received any value, the court must engage in a fact-driven comparison between such value and the transfer or obligation sought to be avoided to determine 'whether the debtor got roughly the value it gave.'"[182]   "The purpose of the [fraudulent

---

[179] *Id.* (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007)) (internal quotations omitted).

[180] *Id.* (quoting *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002)) (internal quotations omitted).

[181] *Official Committee of Unsecured Creditors v. CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.)*, Adv. Case No. 08-51903, 2011 WL 4345204, at *8 (Bankr. D. Del 2011).

[182] *Id.*

conveyance] laws is estate preservation; thus, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors."[183]

The Third Circuit in *In re R.M.L., Inc.* acknowledged that the determination of reasonably equivalent value "is exacerbated in cases where ... the debtor exchanges cash for intangibles, such as services or the opportunity to obtain economic value in the future, the value of which is difficult, if not impossible, to ascertain."[184]  Nevertheless, even "indirect benefits" must be "measured and then compared to the obligations that the bankrupt incurred" to successfully argue reasonably equivalent value.[185]

Transfers made for the benefit of third-parties generally do not furnish fair consideration, but may do so if the debtor receives an indirect benefit through the transfers.[186]  For example, preserving value in a subsidiary by passing along consideration for a transfer by a debtor-parent can constitute reasonably equivalent value.[187]  Similarly, fair consideration exists where a third party pays a debtor's creditor in satisfaction of its own debt with the debtor.  However, as discussed *supra*, this argument for value can conflict with a defendant's preference arguments where it is also

---

[183] *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991).

[184] *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148 (3d Cir. 1996); *see also EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 641-42 (Bankr. D. Del. 2006).

[185] *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 213 (3d Cir. 2006) (citing *Mellon Bank, N.A.*, 945 F.2d at 648) (internal quotations omitted).

[186] *See Metro Communications, Inc.*, 945 F.2d at 646-47 (citing *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981)).

[187] *See Johnson v. First Nat. Bank*, 81 B.R. 87, 89 (Bankr. N.D. Fla. 1987) (citing *Garrett v. Falkner (In re Royal Crown Bottlers of North Ala., Inc.)*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982)).

argued the third-party payment does not constitute a transfer to a creditor on account of antecedent debt pursuant to § 547(b).[188]

Defendant claims TFI received reasonably equivalent value from the Transfers because in doing so TFI "receive an economic benefit preserving its net worth by satisfying *via* payment to [IDS] its obligation to pay the debts of [TRI] out of its disbursement account."[189]  Defendant is correct to say that the Transfers could constitute reasonably equivalent value under the 'indirect benefit' doctrine, through the preservation of economic benefit in its subsidiary to which it maintained an "obligation to pay … debts ..."[190]  To the extent this argument for reasonably equivalent value conflicts with the Defendant's preference argument, the conflict is more appropriately dealt with in the discussion over the § 547(b) elements.  In this context, however, the evidence viewed in the light most favorable to the Defendant supports a finding of reasonably equivalent value.

The Court consequently denies the Liquidating Trustee's request for partial summary judgment on § 548(a)(1)(B)(i), as the Defendant has shown it has likely provided reasonably equivalent value.

---

[188] It is worth noting that the Defendant claims this case is antiquated and has been substituted by the "indirect benefit" doctrine.  In fact, the Bankruptcy Court in *Computer Universe* explicitly endorsed the indirect benefit doctrine, but found it not mutually exclusive with its third-party transaction analysis.  *See In re Computer Universe, Inc.*, 58 B.R. at 32 (citing *Rubin*, 661 F.2d at 992).

[189] D.I. 73, p. 25 (italics in original).

[190] *Id.*

### 2.  *Discovery Request*

"A [discovery] schedule may be modified only for good cause and with the judge's consent."[191]  Therefore, "reopening discovery … require[s] a showing of good cause."[192]  Whether to reopen discovery is "to the sound discretion of the trial court."[193]  "Courts have considered multiple factors when determining whether to grant motions to reopen … [including] (1) whether trial is imminent; (2) whether the request is opposed; (3) whether the non-moving party would be prejudiced; (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court; (5) the foreseeability of the need for additional discovery in light of the time allotted by the district court; and (6) the likelihood that the discovery will lead to relevant evidence."[194]

Both parties agree that the Liquidating Trustee must still meet the insolvency elements of fraudulent transfer under § 548(a)(1)(B)(ii).  To that end, the Liquidating Trustee has requested an extension of discovery to procure expert testimony on the insolvency.  Defendant contends that to re-open expert discovery after its original conclusion on April 30, 2016 is inappropriate.  Liquidating Trustee has not filed a separate motion to reopen discovery.

---

[191] FED. R. CIV. P. 16(b)(4).

[192] *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 576 F.Supp.2d 128, 133 (D.D.C. 2008).

[193] *Vineberg v. Bissonnette*, 548 F.3d 50, 55 (1st Cir. 2008); *see also Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212-13 (3d Cir. 1984).

[194] *Watt v. Clear Business Solutions, LLC*, 840 F.Supp.2d 324, 326 (D.D.C. 2012) (quoting *Childers v. Slater*, 197 F.R.D. 185, 188 (D.D.C. 2000)) (citing *Smith v. U.S.*, 834 F.2d 166, 169 (10th Cir. 1987); and *Vineberg*, 548 F.3d at 55) (internal quotations omitted).

A dispute of material fact remains regarding whether the (B)(i) element has been satisfied. Therefore, there exists a strong likelihood that additional discovery may generate relevant evidence regarding the count for fraudulent conveyance, particularly to the (B)(ii) insolvency elements. The Court will thus grant the reopening of discovery for ninety days after entry of the order.

## <u>CONCLUSION</u>

For the reasons and to the extent set forth above, the Motion is granted, in part, and denied, in part.  Summary judgment is entered as to the § 547(b) preference elements, provided that summary judgment is not entered solely to the issues of whether the Transfers were an interest of TRI in property, and whether the Transfers were to or for the benefit of TFI as a creditor on account of an antecedent debt.  Summary judgment is also entered for the inapplicability of the § 547(c)(1) contemporaneous exchange of new value defense. Summary judgment is not entered as to the inapplicability of the § 547(c) ordinary course of business and subsequent new value defenses, the disallowance or setoff, or the satisfaction of § 548(a)(1)(B)(i). Finally, the Court will grant the reopening of discovery for ninety days after entry of the order.

An order will be issued.